THE DEPARTMENT OF TRANSPORTATION *ex rel.* THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. CENTRAL STONE COMPANY *et al.*, Defendants-Appellees.

Fourth District   No. 4—89—0939

Opinion filed August 2, 1990.—Rehearing denied September 5, 1990.

GREEN, J., specially concurring.

Neil F. Hartigan, Attorney General, of Springfield (Robert W. Neirynck, Special Assistant Attorney General, of Bloomington, and Michael J. Luke, Assistant Attorney General, of Springfield, of counsel), for appellant.

Keefe, Gorman & Brennan, of Quincy (Jerry L. Brennan, of counsel), for appellees.

JUSTICE STEIGMANN delivered the opinion of the court:

The Department of Transportation (DOT) appeals from a jury verdict awarding a landowner, Central Stone Company, compensation totaling $1,776,300 for land taken by DOT in eminent domain proceedings. DOT argues that Thomas Newman, a valuation expert

called by Central Stone, improperly valued only the limestone reserves rather than the land as a whole.

We agree and remand for a new trial.

▉ The Illinois Constitution states, "[p]rivate property shall not be taken or damaged for public use without just compensation as provided by law." (Ill. Const. 1970, art. I, §15.) The purpose of this provision is not to place the owner in a better position than he was in before his land was taken, but to make him whole. (*Department of Public Works & Buildings v. Hubbard* (1936), 363 Ill. 99, 103, 1 N.E.2d 383, 385.) "Just compensation is the fair market value of the property at its highest and best use on the date of filing of the petition." *Department of Public Works & Buildings v. Association of Franciscan Fathers* (1977), 69 Ill. 2d 308, 314, 371 N.E.2d 616, 618.

> "The highest and best use may be the present use to which the property is actually put or:
> 'any capacity for future use which may be anticipated with reasonable certainty, though dependent upon circumstances which may possibly never occur, *** if it in fact enhanced the market value of the land in its present condition and state of improvement. The future prospective use affecting value must be a present capacity for a use which may be anticipated with reasonable certainty and made the basis of an intelligent estimate of value.' *Crystal Lake Park District v. Consumers Co.* (1924), 313 Ill. 395, 406."
>
> *City of Chicago v. Anthony* (1990), 136 Ill. 2d 169, 174-75, 554 N.E.2d 1381, 1383-84.

The fair market value of the property is the measure for determining just compensation. (*City of Chicago v. Cunnea* (1928), 329 Ill. 288, 295, 160 N.E. 559, 562.) The Code of Civil Procedure defines "fair market value" as follows:

> "Except as to property designated as possessing a special use, the fair cash market value of property in a proceeding in eminent domain shall be the amount of money which a purchaser, willing but not obligated to buy the property, would pay to an owner willing but not obliged to sell in a voluntary sale, which amount of money shall be determined and ascertained as of the date of filing the complaint to condemn. In the condemnation of property for a public improvement there shall be excluded from such amount of money any appreciation in value proximately caused by such improvement, and any depreciation in value proximately caused by such improvement. However, such appreciation or depreciation shall not be ex-

cluded where property is condemned for a separate project conceived independently of and subsequent to the original project." Ill. Rev. Stat. 1987, ch. 110, par. 7—121.

There are three methods for calculating fair market value:

"The cost approach consists, basically, of estimating the value of the land and then adding to it the value of the improvements less depreciation. *** The market approach is used by finding similar land and improvements which have recently been sold, and then comparing those with the present real estate to determine a fair value. The income approach is reached by determining what income the real estate would produce if it were rented." (*Department of Transportation v. Quincy Coach House, Inc.* (1976), 64 Ill. 2d 350, 354, 356 N.E.2d 13, 15.)

The Illinois Supreme Court has approved of each of these methods of valuation "if the proper circumstances are present." *People ex rel. Director of Finance v. YWCA* (1979), 74 Ill. 2d 561, 571, 387 N.E.2d 305, 310.

The presence of minerals under the surface affects the valuation of condemned land.

"It is the rule in Illinois that minerals deposited on land to be condemned should not be considered separately in any determination of value. Department of Public Works and Buildings v. Hubbard, 363 Ill. 99, 102, 1 N.E.2d 383; Forest Preserve Dist. of Cook County v. Caraher, 299 Ill. 11, 17, 132 N.E. 211. It is felt that a separate valuation on the deposits must include the elements of prospective profits, market demands, costs and other factors of a speculative nature and therefore are too uncertain to be properly employed. City of Chicago v. Central Nat. Bank in Chicago, 5 Ill. 2d 164, 125 N.E.2d 94. It is proper, however, to consider the presence of the minerals as part of the overall value of the land." *Illinois Building Authority v. Dembinsky* (1967), 90 Ill. App. 2d 451, 455, 233 N.E.2d 38, 40.

See also *Department of Transportation v. Toledo, Peoria & Western R.R. Co.* (1979), 75 Ill. 2d 436, 389 N.E.2d 546; *Department of Transportation v. Mullen* (1983), 120 Ill. App. 3d 268, 457 N.E.2d 1362.

■ When only a portion of the owner's land is taken by eminent domain, additional issues are raised. First, the trier of fact must determine what is to be paid for the portion taken. Next, the trier of fact must decide whether the remainder has been damaged and, if so, the amount of compensation for the damage. (*Department of*

*Transportation v. Bouy* (1979), 69 Ill. App. 3d 29, 39, 386 N.E.2d 1163, 1170.) The portion of the tract to be taken in eminent domain must first be valued as a part of the whole tract before the taking and not as a separate piece of property. (*Tri State Park District v. First National Bank* (1975), 33 Ill. App. 3d 348, 337 N.E.2d 204.)

> "The measure of compensation for land not taken by the improvement is the difference between the fair cash market value of such property before and after the improvement. (*Illinois Power Co. v. Wieland,* 324 Ill. 411; *Brand v. Union Elevated Railroad Co.* 258 [Ill.] 133.) Compensation for land taken is to be estimated on the value of the land as land, with all its capabilities." (*Hubbard,* 363 Ill. at 101-02, 1 N.E.2d at 384.)

(See also *Department of Transportation v. Shell Oil Co.* (1987), 156 Ill. App. 3d 304, 306, 509 N.E.2d 596, 598; *Department of Public Works & Buildings v. Crumbaugh* (1971), 1 Ill. App. 3d 761, 762, 274 N.E.2d 161, 162.) "The measure of recovery for damages to the remainder in a condemnation action is the depreciation in market value of the remainder resulting from the taking." *Department of Transportation v. Hsueh* (1983), 117 Ill. App. 3d 945, 947, 454 N.E.2d 360, 362.

▉ The market approach, also known as the comparable sales approach, is appropriate for valuing the condemned property in this case. This approach looks "to comparable sales of land based on similarities in locality, character, time, proximity, market conditions, improvements, and modes of payment." (*People ex rel. Department of Transportation v. Birger* (1987), 155 Ill. App. 3d 130, 134, 507 N.E.2d 1321, 1324.) Evidence of a comparable sale provides the jury with an objective market evaluation against which it can consider an appraiser's valuation of the property. *Birger,* 155 Ill. App. 3d at 135, 507 N.E.2d at 1325.

In this case, DOT filed a complaint for condemnation against Central Stone on October 7, 1987, seeking to take 30 of 172 acres owned by Central Stone and operated as a limestone quarry. DOT needed the land for construction of Federal Aid Route 408, also known as the Central Illinois Expressway. Central Stone purchased the land in 1974 for $525 an acre and began quarry operations around 1980. The property in question is also known as the Fesler property.

The Pike County circuit court permitted a quick-take on October 29, 1987, and ordered DOT to pay Central Stone $177,000 compensation. The court amended its order on May 3, 1988, and directed DOT to pay $761,787.60 as compensation.

Prior to trial, the circuit court granted DOT's motion *in limine,* preventing Central Stone's valuation witnesses from testifying to the following:

> "1. an opinion on the value of the subject property by using the product of the estimated amount of mineral deposits and a fixed price per unit;
>
> 2. an opinion on the value of the subject property based on a capitalization of the present or future value of the quarry business;
>
> 3. an opinion on the fair market value of the mineral deposits apart from the value of the subject property;
>
> 4. an opinion on valuation of the subject property based on past or future profits of the quarry business;
>
> 5. testimony on the quantity and price of minerals in the absence of the introduction of a market for said commodity."

Trial began on September 18, 1989, with the testimony of Richard Klinster, a geologist for Central Stone. He testified that most of the limestone reserves on the property were in the portion remaining after the taking. He also testified it would not be economically feasible to quarry the reserves after the taking by DOT. Roger Akers, a self-employed farm appraiser called by Central Stone, opined that the highest and best use of the property was for agriculture. He used the comparable sale approach and valued the remaining land at $35,345. After the taking, he estimated there were 49.2 tillable acres in the remaining tract.

Trial continued the following day and began with the jury viewing the premises. Central Stone then called Thomas Newman, an industrial minerals geologist employed by J.M. Huber Corporation of Quincy, Illinois. He appraises limestone quarries for his employer and appraised the Fesler property at Central Stone's request. He appraised the property as of October 7, 1987, the date DOT filed its condemnation petition. After examining the Fesler property and geological data about it, Newman concluded the property's highest and best use was as a quarry.

Newman valued the whole property, before the taking, at $1,826,000. He valued the portion taken by the State at $318,000. The value of the remainder *before* the taking was the difference between the two figures above, or $1,508,000. He expressed no opinion as to the value of the remainder after the taking, but testified the remainder was no longer viable as a quarry.

On cross-examination, Newman testified he normally uses the income approach to value quarries. In this case, however, he used the

market approach because he understood it to be the only acceptable method under Illinois law. He compared the Fesler property to the 40-acre Kinderhook quarry sold by Hanesco to Western Illinois Stone Company, the same corporate entity as Central Stone, in October 1986. The Kinderhook property sold for $31,746. The Kinderhook quarry is part of the same geological formation as the Fesler property and so the stone quality was identical. The Kinderhook property was valued at $720 per acre. Newman estimated the Kinderhook property had 500,000 tons of limestone. On the other hand, the Fesler property had 29 million tons of reserves and so Newman made adjustments for quantity and valued the property at approximately $10,000 per acre. He arrived at these figures by dividing his $1,826,000 valuation of the Fesler property by 172 acres, the total acreage, which gave him a price per acre. He then multiplied that figure by 30 acres, the portion taken by the State, to arrive at $318,000 as the value of the land taken.

James Ellis, president of Central Stone, was Central Stone's final witness. He agreed with Newman's valuation of the land. He believed the 30 acres taken by the State were the "key" to the entire tract and the remainder would be suitable only for farming.

DOT's only witness was Wayne Briggs. He testified that the highest and best use of the Fesler property was for agriculture. He calculated the fair market value of the land on October 7, 1987, as $465 per acre, or $80,000 total. He valued the portion taken by the State at $16,500 and estimated $250,000 as the cost of curing damages to the remainder. Then he testified that if the remainder was used for agricultural purposes, it would suffer no damage.

The jury awarded Central Stone $318,000 as the value of the land taken and $1,458,300 as damages to the remainder. The circuit court entered judgment on the verdict, which totaled $1,776,300, on September 20, 1989. DOT's motion for post-trial relief was denied.

■ The primary issue on appeal is whether the circuit court erred in refusing to strike Newman's valuation testimony. We conclude the circuit court should have stricken Newman's testimony because he equated the value of the minerals with the value of the land, as shown by the following cross-examination:

"[DEFENDANT'S COUNSEL]: And that's the same thing, the figure, the value of the land, taking the fact that there's minerals there is the same as the mineral wealth?

[NEWMAN]: I believe so.

[DEFENDANT'S COUNSEL]: And that's how you arrived at what, with your approach on the reserves?

[NEWMAN]: Yes.

[DEFENDANT'S COUNSEL]: And there's no, at the time of the taking, there was no value to the land apart from its mineral wealth?

[NEWMAN]: I believe once again the criteria is highest and best use. As a quarry, you have to use the mineral wealth. There was farming above that, but I'm not a farm appraiser."

Newman later testified: "In farming acres is the proper way I guess of doing an appraisal. I'm not a farm appraiser. But in stone, stone is a function of volume, and so you do have to go to depth. We do use the term acre feet. One acre rock one foot thick and how deep it goes." Newman's valuation violated the rules of Illinois Supreme Court cases, which have held that minerals are not to be valued separately from the land.

The rule violated in this case originated in *Forest Preserve District v. Caraher* (1921), 299 Ill. 11, 132 N.E. 211, a case involving timber rather than minerals. There, in a condemnation case, the circuit court permitted a landowner's witness to testify to the value of timber upon the land to be taken. The supreme court noted the opinion of the witness was stated in terms of the value of the timber as it stood, uncut. However, the court concluded the witness was stating the value of the timber as cut lumber with a deduction taken for the cost of cutting. The court also noted no evidence was produced as to what the land would be worth after the trees were removed. The supreme court set forth the following language: "The rule is that compensation must be estimated for the land as land, with all its capabilities, and if there is timber on it, or coal, oil or other minerals under the surface, they are to be considered so far as they affect the value of the land, but they cannot be valued separately." *Caraher*, 299 Ill. at 17, 132 N.E. at 213.

The primary case involving valuation of minerals is *Department of Public Works & Buildings v. Oberlaender* (1969), 42 Ill. 2d 410, 247 N.E.2d 888. The condemned property in *Oberlaender* included a sand quarry in operation for more than 50 years. At trial the parties presented evidence on the nature and character of the sand, its actual and potential uses, the ways in which it differed from sand deposits on other similar properties, and the property's favorable location with respect to the sand market, transportation, and market potential. Evidence conflicted as to the quantities of sand on the property.

Three valuation witnesses testified. Davis valued the condemned portion at $600,000, based on what could be realized from the sand

deposits if processed using normal methods. He valued the sand as part of an ongoing business and based his opinion on what the property would be worth if he were to buy the sand and the business. Chadwick valued the condemned property at $550,000. He independently valued the sand deposit with a dollar value set on reserves, considering a unit market price and then adding this to the value of the land remaining after the sand was removed. Reese valued the condemned tract at $625,000, after valuing the property as sand deposited in the ground. He used a projection of the owner's increasing production record to reach his opinion. The jury returned a verdict awarding $600,000. The appellate court reversed, and the Illinois Supreme Court affirmed the appellate court.

The supreme court ruled that the circuit court should have stricken the valuation testimony of all three valuation witnesses. The court quoted the rule from *Caraher* and then reworded it for clarification:

> "Putting it somewhat differently, where, as here, the property is not taken for the purpose of obtaining the minerals or a going business [citations], it is improper to appraise separately the mineral deposit and add its value to the value of the land without the deposits [citations]. It is proper, however, for the owner to establish the existence of valuable mineral deposits on the real estate being valued and in doing this to show the character of the deposit(s) and to what extent it enhances the land's market value." *Oberlaender*, 42 Ill. 2d at 415-16, 247 N.E.2d at 892.

The *Oberlaender* opinion cited, as authority for the foregoing rule, the case of *Department of Public Works & Buildings v. Lotta* (1963), 27 Ill. 2d 455, 199 N.E.2d 238. There, the court held a trial court had not erred when, in a condemnation case, it struck the testimony of a landowner's appraiser who valued land by adding his estimate of the value of the improvements on the land to his estimate of the value of the land without the improvements. The theory of the supreme court's ruling was that the actual fair cash market value of a property does not necessarily equal the sum of the values which might be placed on its attributes. Similarly, the actual fair cash market value of a tract containing mineral deposits is not necessarily the sum of values which might be placed separately on the land and its deposits.

Two clear rules arise from *Caraher* and *Oberlaender* concerning valuation of land containing resources which can be extracted. One rule, not directly involved here, is that the resources must be consid-

ered on the basis that they add to the total value of the tract and not directly as to the sales price after extraction. The other rule is that the value of the land and a separate value of the resources cannot be added to create a value for the tract. The obvious reason for the latter rule is, as explained by Justice Schaefer in *Lotta,* that the value of land does not always equal the sum of the value of all of its parts, and some if its attributes may impair the value of others.

In *Department of Transportation v. Toledo, Peoria & Western R.R. Co.* (1979), 75 Ill. 2d 436, 389 N.E.2d 546, the State sought the land only to remove fill material for use in highway construction. Before condemnation proceedings began, the railroad sold fill material from the property to a contractor for use in the highway construction at 12 cents per cubic yard. The railroad argued that just compensation was 12 cents per cubic yard of fill material removed. The supreme court disagreed. Reiterating its holding in *Oberlaender,* the court held the land had to be valued as a whole, not just as fill material in that particular market.

Newman's testimony violated the rules of these cases and should have been stricken. Although an expert may express an opinion as to the fair cash market value of a piece of property in an eminent domain case, the circuit court must first determine whether the facts or data upon which the opinion is based are admissible.

> "The proper factors which may be taken into consideration in determining just compensation must be determined by the trial court as a question of law. (*Johnson,* 343 Ill. at 16.) An expert in valuation of property for condemnation purposes may only rely upon facts or data which are legally relevant to the issue of the fair cash market value of the property in question. To the extent that an expert relies upon facts or data which are irrelevant to proving the fair cash market value of the property in question, then the facts or data so relied upon would not be based upon lawful elements of damage and would be of no benefit to a jury. *Illinois Power & Light Corp. v. Talbott* (1926), 321 Ill. 538, 544." *Anthony,* 136 Ill. 2d at 187, 554 N.E.2d at 1389.

We conclude that Newman's testimony was an opinion on the fair market value of the mineral deposits apart from the value of the property, and, as such, should not have been admitted into evidence. We find its admission to be reversible error.

> "It is clear that where an award is made by a jury in an eminent domain proceeding in which the evidence is conflicting and the jury views the property and fixes the amount of com-

pensation within the range of the evidence, the verdict will not be disturbed unless there has been a clear and palpable mistake or a showing that the verdict was the result of passion or prejudice." *City of Freeport v. Fullerton Lumber Co.* (1981), 98 Ill. App. 3d 218, 223-24, 423 N.E.2d 924, 928-29.
See also *Oak Brook Park District v. Oak Brook Development Co.* (1988), 170 Ill. App. 3d 221, 243, 524 N.E.2d 213, 227; *Department of Conservation v. Dorner* (1989), 192 Ill. App. 3d 333, 342, 548 N.E.2d 749, 754; *Central Illinois Public Service Co. v. Rider* (1957), 12 Ill. 2d 326, 329, 146 N.E.2d 48, 50; *Kassnel v. Village of Rosemont* (1985), 135 Ill. App. 3d 361, 371, 481 N.E.2d 849, 856.

In this case there was a clear and palpable mistake, necessitating reversal.

The second issue on appeal is whether the circuit court erred in allowing James Ellis, president of Central Stone, to testify to the value of the property even though he had not been disclosed as an expert witness pursuant to Supreme Court Rule 220 (107 Ill. 2d R. 220).

Ellis is the president of Central Stone and owns stock in the company. He is also chairman of the board of Moline Consumers, holding company of Central Stone. He owns stock in Moline Consumers, but is not a controlling shareholder in either company. Ellis is a 1940 graduate of the Massachusetts Institute of Technology (MIT), with a degree in mining engineering. He has worked in the quarry business since 1945.

Ellis testified, over an objection by DOT, that Newman's valuation of $1,825,000 was reasonable. Ellis also agreed with Akers' conclusion that, after the taking, the remaining land could be used only as farmland.

DOT argued that the circuit court erred in refusing to strike Ellis' testimony because he was not disclosed as an expert witness as required by Supreme Court Rule 220. Central Stone asserts DOT was not surprised that Ellis testified, but only that he graduated from MIT in mining engineering. Additionally, Central Stone argues Ellis' testimony was not that of an appraisal expert hired for trial.

Rule 220 defines an expert as:
"[A] person who, because of education, training or experience, possesses knowledge of a specialized nature beyond that of the average person on a factual matter material to a claim or defense in pending litigation and who may be expected to render an opinion within his expertise at trial. He may be an employee of a party, a party, or an independent contractor."

(107 Ill. 2d R. 220(a)(1).)

The rule requires disclosure of experts during discovery and failure to disclose an expert results in disqualification of the expert as a witness. 107 Ill. 2d R. 220(b)(1).

■ Ellis was not called as an expert witness, but as the president of the company which owns the property. In this case the "owner" happens also to have a degree in mining engineering from a prestigious institution. "It has been repeatedly held that the owner of property, if at all qualified, may testify as to value. (*Department of Transportation v. Harper* (1978), 64 Ill. App. 3d 732, 381 N.E.2d 843.)" (*City of Freeport*, 98 Ill. App. 3d at 222, 423 N.E.2d at 928; see also *Hill v. Ben Franklin Savings & Loan Association* (1988), 177 Ill. App. 3d 51, 56, 531 N.E.2d 1089, 1098.) The rationale for allowing a landowner to state his opinion as to the value of his land is not that he qualifies as an expert. The landowner's familiarity with his own land does not, in and of itself, constitute expertise. (*Hill*, 177 Ill. App. 3d at 57, 531 N.E.2d at 1093.) Rather, the landowner's opinion is admissible as lay witness opinion testimony. E. Cleary & M. Graham, Cleary & Graham's Handbook of Illinois Evidence §§701.1, 701.3, at 445, 446-48 (4th ed. 1984).

Even if Ellis' testimony were to be considered as expert testimony, it would not be barred by Rule 220.

"In *Tzystuck v. Chicago Transit Authority* (1988), 124 Ill. 2d 226, 234, 529 N.E.2d 525, 528, it was held that Rule 220(b)(1) 'obliges litigants to disclose the identity and opinions only of those witnesses who are engaged for the purpose of giving an expert opinion at trial.' In *Tzystuck*, the supreme court stated that treating physicians testifying at trial are not subject to the disclosure requirements of Rule 220(b)(1) because they are consulted for treatment purposes whether or not litigation is pending or contemplated and do not develop their opinions in anticipation of litigation. (124 Ill. 2d at 234, 529 N.E.2d at 528.) The court noted in *Tzystuck* that a treating physician's opinion is, in this respect, similar to that of an occurrence witness who testifies not because he was retained by a party who expected him to develop and give a particular opinion at trial, but because he 'witnessed or participated in the transactions or events that are part of the subject matter of the litigation.' (124 Ill. 2d at 234-35, 529 N.E.2d at 528-29.) Likewise, we conclude that a party to a suit cannot be said to be retained to render an opinion at trial. A party is not engaged for the purpose of giving expert opinion at trial, but rather is a partici-

pant in the transaction that is the subject matter of the litigation." (*Hill*, 177 Ill. App. 3d at 57-58, 531 N.E.2d at 1093-94.)
The circuit court correctly allowed Ellis' testimony.

The judgment of the Pike County circuit court is reversed and the cause remanded.

Reversed and remanded.

McCULLOUGH, J., concurs.

JUSTICE GREEN, specially concurring:
I concur in the decision of the majority to reverse and remand for a new trial because of error in the admission of the testimony of the witness, Newman. However, I deem the issues raised by that testimony to be closer than does the majority. I question whether error in the refusal to strike the testimony can be sufficiently explained by describing the testimony as valuing only the limestone reserves rather than the land as a whole.

Certainly, Newman did not "appraise separately the mineral deposit and add its value to the value of the land without the deposits" (*Oberlaender*, 42 Ill. 2d at 415, 247 N.E.2d at 892), which is at the heart of the prohibitions set forth in more recent years in *Oberlaender* and *Lotta*. Rather, the majority concludes from the cross-examination of Newman that he valued only the minerals in the land and gave no consideration of the other attributes of the land. Such a valuation was deemed erroneous by the *Oberlaender* court in ruling upon the testimony of the witness Reese. Notably, under such circumstances, prejudice can result to the condemnor only to the extent a trier of fact might imply that some other value to the tract exists which should be added to the value to which the witness has testified.

In any event, when the cross-examination of Newman is considered in the context of all of his testimony, I do not find that he gave a separate valuation to the limestone deposits or implied other values should be added to the value to which he testified. His method of appraisal began with the highly recommended procedure of comparing the tract to be appraised to another tract for which a recent arm's length sale had taken place. (*Quincy Coach House, Inc.*, 64 Ill. 2d 350, 356 N.E.2d 13.) Plaintiff does not dispute the comparability of this tract to the Kinderhook tract which was the subject of the sale. Nor does plaintiff dispute the propriety of Newman's consideration of the $31,746 sales price for the recent sale of that tract. Thus,

Newman was comparing a sale of a property with all of its attributes to the instant property with all of its attributes. The consideration of all of the attributes of a property being appraised is at the heart of *Oberlaender* and *Lotta.*

Newman felt the highest and best use for both tracts was for the extraction of the limestone. This caused him to give the inept answers which he gave on cross-examination, but those answers must be considered in connection with the fact that he was using the comparable-sale approach to market value. However, some problem arises because he decided to adjust the sales price of the Kinderhook tract to an evaluation of the tract in issue almost entirely on the basis of the difference in the estimated size of the limestone deposits on the two tracts. As indicated, the instant property was given a slightly higher valuation per unit of deposit because of the economy in mining a larger tract. Newman thought this economy of scale would tend to enhance the market value of this tract.

Perhaps Newman's testimony should have been excluded because he did not give consideration to the difference between the tracts based upon aspects other than their use for the extraction of limestone. However, that seems a rather minor matter in view of his opinion that the highest and best use of the properties was for a quarry. Rather, the impropriety in his testimony seems to me to arise from his assumption that the ratio of size of deposits was the controlling factor in basing a value of defendants' tract upon the Kinderhook sale. No consideration was given to demand for a tract with deposits so much larger than those of the Kinderhook tract.

The *Caraher* opinion tends to discourage appraisals for condemnation purposes which take into consideration market factors in determining the value of a tract. (*Caraher*, 299 Ill. at 18, 132 N.E. at 213.) However, such factors are obviously matters which would be considered by buyers and sellers of quarry sites. While recitation by the witness of figures considered may be improper (*Anthony*, 136 Ill. 2d 169, 554 N.E.2d 1381), failure of an appraisal witness in a condemnation case to consider market forces affecting the price of minerals to be extracted from the land and the products to be made from them has been held to make an appraisal of such land in a condemnation case too speculative to consider. *Department of Transportation v. Mullen* (1983), 120 Ill. App. 3d 268, 278, 457 N.E.2d 1362, 1369.

I would reverse and remand because of the highly speculative nature of Newman's testimony.